FILED
05/15/2024
Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
Assigned on Briefs March 5, 2024 at Jackson

## STATE OF TENNESSEE v. CHAD ANTHONY TURNER

**Appeal from the Criminal Court for Bradley County**
**No. 21-CR-280B     Andrew M. Freiberg, Judge**

_____

### No. E2023-00577-CCA-R3-CD

_____

Defendant, Chad Anthony Turner, entered an open guilty plea to theft of property $250,000 or more, a Class A felony.  He was sentenced to sixteen years' incarceration and ordered to pay $100,000, in restitution to be paid in monthly installments of $700, should he make parole.  On appeal, Defendant contends the trial court erred by imposing a restitution amount without any significant findings on Defendant's financial resources and ability to pay and conditioned on the possibility of parole, by ordering a restitution amount which could not be satisfied prior to the end of his sentence, and by denying his request for an alternative sentence.  Upon review of the record, the parties' briefs, and the applicable law, we affirm the judgment of the trial court regarding the length and manner of Defendant's sentence.  However, we reverse the trial court's restitution order and remand for a new restitution hearing consistent with this opinion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part and Reversed in Part**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Kendall Stiver Jones, Assistant Public Defender (on appeal); and R. Garth Best, Chattanooga, Tennessee (at plea), for the appellant, Chad Anthony Turner.

Jonathan Skrmetti, Attorney General and Reporter; Raymond J. Lepone, Assistant Attorney General; Shari Tayloe, District Attorney General; and Paul Moyle, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Facts and Procedural History**

This case arose when Defendant, the highest salaried employee at Swift Enterprises, stole $271,000 from a client, U.S. Xpress, from September 28, 2020, to May 11, 2021. Swift Enterprises was a long-haul trucking service that contracted with U.S. Xpress to provide dedicated hauling for U.S. Xpress's customer, MasterBrand cabinets. Robert Siira[1] and Cecil Watkins were employed as drivers at Swift Enterprises and dedicated to haul MasterBrand cabinets for U.S. Xpress.

The theft involved a scheme of creating and authorizing fake "lumper" fees. When drivers reached their destinations, they sometimes used a contract laborer, referred to as a "lumper," to unload the trucks. Lumpers typically charged a flat fee for their services. In this case, U.S. Xpress required its drivers to provide documentation that a lumper was used; then, U.S. Xpress directly billed MasterBrand for the lumper fee, and money for the payment of the fee was then loaded onto a Transcard account created by U.S. Xpress in the driver's name. The driver could then withdraw cash from the Transcard to pay the lumper, and the driver returned the receipt to U.S. Xpress. Swift Enterprises was not charged with the lumper fee advanced to the driver. As a result of this payment process, Swift Enterprises never saw the lumper fee transaction on its end. The lumper fee was commonly negotiated in advance, and in the contract between Swift Enterprises and U.S. Xpress, the standard lumper fee was $250. Lumpers were not used on delivery of all loads.

In April 2021, U.S. Xpress notified Swift Enterprises that Mr. Siira and Mr. Watkins had charged excessive lumper fees in the prior month and had in fact received numerous lumper fees advanced to them in the amounts of $601.25 each instead of the contracted amount of $250. Based on this information, U.S. Xpress conducted a forensic audit to determine the origin and destination of the fees. However, it lacked the ability to view the transaction history for the funds loaded onto the drivers' Transcard accounts. Consequently, a judicial subpoena was obtained for records of the drivers' Transcard transaction history. The records revealed that Mr. Watkins had received ninety-six unauthorized lumper fee advances of $601.25 each from November 17, 2020, to April 6, 2021, and Mr. Siira had received 148 unauthorized lumper fee advances of $601.25 each from November 9, 2020, to April 24, 2021. Until Defendant's arrest on May 11, 2021, unauthorized lumper fee advances continued to be approved.

---

[1] Mr. Siira's name is spelled "Sierra" in the transcripts. We will spell his last name as it is spelled in the indictment.

Swift Enterprises suspected that one of its employees may have authorized the excessive lumper fees, and thus installed video surveillance and computer monitoring software to determine how the fees were being authorized. The software and surveillance video both captured the "scam" in real time as Defendant used his computer to send messages to the two drivers and create lumper fees on loads that were not authorized or loads that did not use lumpers. Once the scheme was uncovered, it was determined that the total out-of-pocket loss to MasterBrand, who paid the unauthorized fees, was in excess of $271,000. MasterBrand was made whole by U.S. Xpress, who was made whole by Swift Enterprises.

Defendant was arrested on May 11, 2021, and taken to the Bradley County Justice Center where he waived his *Miranda* rights and agreed to be interviewed. Defendant stated that in the transportation industry, it was his job to "rape and pillage the customer." He made it clear several times during the interview that he understood it was wrong to authorize the lumper fees and would work to "make it right." The day after his arrest, Defendant admitted to his wife during a phone conversation that he had been "manipulating the system" and taking money to pay the bills. He also told her that he had been "sick about it for months."

The Bradley County Grand Jury charged Defendant in a four-count indictment for theft of property $250,000 or more, a Class A felony (count one); conspiracy to commit theft $250,000 or more, a Class B felony (count two); unlawful access of computer or telecommunication system for fraudulent use $250,000 or more, a Class A felony (count three); and money laundering, a Class B felony (count four). Mr. Siira and Mr. Watkins were charged as co-defendants in counts one and two. Pursuant to a negotiated settlement, Defendant entered an open plea of guilt to theft of property $250,000 or more, as charged in count one, with the trial court to determine the length and manner of sentencing. The remaining counts were dismissed.

At the sentencing hearing, Gregory A. Swift, the president and chief executive officer ("CEO") of Swift Enterprises testified that he had been CEO for twenty-eight years. He founded the company in 1995 in Cleveland, Tennessee after military service, service in the Colorado State Patrol, and service as director of law enforcement training for the Department of Energy in Washington, D.C. Mr. Swift testified that his company employed 100 drivers and eighteen in-office staff. He hired Defendant in 2015 as director of operations and later promoted him to chief operating officer ("COO"). As COO, Defendant was responsible for day-to-day operations of the company, overseeing general gross and net revenue, and managing various budgets, the drivers, the equipment, and in-office staff. As COO, Defendant had access to confidential information about company revenue, budgets, and clients.

- 3 -

In April 2020, while on a fishing trip, Mr. Swift received a call from a representative of U.S. Xpress informing him that someone from Swift Enterprises was stealing money from U.S. Xpress. Mr. Swift installed spyware software on the company computer system to determine what was going on. Mr. Swift could actively see Defendant's computer and documented Defendant's actions on video.

Mr. Swift explained that the lumper fee was always negotiated upfront and in the case of U.S. Xpress was set at $250 per trailer unloaded. When a load was delivered to U.S. Xpress, a customer service employee entered the delivered load into the computer system along with any lumper fee. Mr. Swift learned that Defendant had discovered a vulnerability "very deep" in the layers of U.S. Xpress software, locating the actual page in the software that allowed a lumper fee to be created manually by checking a box for "yes" to create a lumper fee, or "no" to eliminate a fee. Below the box was a line to enter the amount of the fee. Defendant was creating lumper fees on deliveries where no lumper had been used. He would then transfer money to pay the fake lumper fee on the Transcard carried by Mr. Siira and Mr. Watkins for fuel, incidentals, and legitimate lumper fees. Once Mr. Siira and Mr. Watkins received money on the Transcard, they would cash out the amount of the lumper fee and give Defendant the cash by leaving it in his car or depositing it in a Regions Bank account Defendant had expressly set up for this scheme. Defendant gave a portion of the money to Mr. Siira and Mr. Watkins. Mr. Swift confirmed that Mr. Siira and Mr. Watkins were also charged in the case. To cover his tracks after the transaction was completed, Defendant would go back into the system and change the U.S. Xpress software back to showing no lumper fee for that particular load. On paper, it was as if "it never happened." Consequently, "[i]t was almost impossible to catch."

Defendant had worked with U.S. Xpress for twenty years prior to being hired by Swift Enterprises. U.S. Xpress was unaware that its software had this vulnerability to be exploited in this manner. Defendant had penetrated several security layers in the U.S. Xpress software. According to Mr. Swift, Defendant's breach of U.S. Xpress network was "deeper" than anyone had known. Mr. Swift opined that Defendant "would have to spend a lot of time investigating this and see if it would work[.]" According to Mr. Swift, it appeared that Defendant started stealing "a little bit at a time and . . . then wait[ed] . . . to see if he was going to get caught." When the theft went unnoticed, Defendant began "dumping it daily" and would even come in on Saturdays to create unauthorized lumper fees.

Mr. Swift understood that U.S. Xpress had since corrected the software vulnerability. Because U.S. Xpress "had no idea" someone could reach that layer of the software, they had "no reason" to look for any problems. Mr. Swift had no way of finding out what was happening on his end because Defendant was taking the cash and changing

the system back before any of the transactions reached Mr. Swift. By the time U.S. Xpress discovered the issue, the two drivers had charged $271,000 of unauthorized lumper fees.

Mr. Swift confirmed that Defendant was the highest paid person at Swift Enterprises with an annual salary of $125,000-$150,000 plus bonuses. Additionally, Swift Enterprises had loaned Defendant $20,000-$30,000 for a down payment on a house. Defendant never repaid the loan. Mr. Swift also testified that Defendant received two cars he did not pay for. Mr. Swift learned from the criminal investigation that Defendant spent the money on cars, guns, and "other women." Defendant had six cars in his driveway, several of them priced over $75,000, and over a dozen guns were found underneath his bed.

Defendant created 452 transactions of individual lumper fees. An audit conducted by U.S. Xpress, confirmed that Defendant stole $271,000. Mr. Swift and U.S. Xpress set up a payment plan where Mr. Swift would repay U.S. Xpress in full in $10,000 weekly installments.

Mr. Swift testified that in addition to manipulating the software to create unauthorized lumper fees, Defendant had mismanaged Swift Enterprises' maintenance budget. Mr. Swift explained that if a Swift Enterprises truck broke down during a delivery, it was towed to a body shop for repair and U.S. Xpress issued a purchase order for the repair work to be paid by Swift Enterprises. Swift Enterprises then audited the purchase order and either refuted the bill or agreed to the amount in which case the amount was deducted from U.S. Xpress's payment to Swift Enterprises. U.S. Xpress informed Mr. Swift in spring 2021 that Swift Enterprises had accrued a maintenance bill of $750,000. In approximately eighteen months, Defendant had failed to pay hundreds of repair purchase orders. Without Mr. Swift's knowledge and permission, Defendant as agent of the company signed a promissory note to U.S. Xpress to pay the outstanding maintenance bill at a rate of $15,000 per week. Mr. Swift testified that he asked Defendant "quite regularly" about the maintenance budget with U.S. Xpress and Defendant "constantly" assured him that he was working on it and that the bill was around $100,000 or $150,000 which was not unusual for a company the size of Swift Enterprises.

Mr. Swift testified that his company's relationship with U.S. Xpress had vastly improved since Defendant's employment had been terminated. At the time of the hearing, Swift Enterprises had repaid U.S. Xpress $271,000 for the unauthorized lumper fees and $750,000 for the maintenance bills.

Mr. Swift testified that before Defendant was caught in this scheme, a bookkeeper had embezzled $221,000 from Swift Enterprises while Defendant was an employee. The bookkeeper had been charged, convicted, sentenced to eight years split confinement, and ordered to pay restitution. Mr. Swift confirmed that Defendant was aware that the

bookkeeper had been criminally charged. Mr. Swift asked the court to sentence Defendant to confinement within the appropriate range of punishment. The loss was not covered by insurance. He believed that a sentence of confinement would serve as a deterrent:

> This is a lot of money, and it was over a long period of time, and it was very thought out. He had accomplices and this went on and on. He was very bold about it. He would do it with me in the office, walking down the hall. He would come in on Saturdays and steal the money. He . . . had no moral fiber about him at all about it. He had no – he's not remorseful even now, it appears, about it. And the way he spent it, he just frivolously spent the money. It was not to the betterment of his family or – he just took it and spent it.

Mr. Swift described how Defendant's crimes impacted his company:

> It was very hard on us. He almost bankrupt[ed] us, as you can imagine. I was paying $25,000 a week for a long time to get this paid off. So we – we had to suspend – we had to cut our fleet down a hundred trucks. We had to drop our gross revenue. We had to cut people out of the office that we didn't want to just to be able to make it during that time.

Sharon Gaston of the Department of Correction wrote and prepared Defendant's presentence report. Ms. Gaston testified that Defendant had no criminal record and had no history of alcohol or drug abuse. She confirmed that Defendant had not engaged in any criminal activity since the underlying crimes but added that he had been incarcerated since his arrest. She interviewed Defendant for the presentence report and heard his version of what had occurred. She did not recall Defendant saying that he was sorry for what he had done. According to Ms. Gaston, Defendant "mostly talked about finding religion."

Ms. Gaston testified that Defendant's STRONG-R assessment showed that he was at low risk of re-offending and of low to moderate need for family. When asked to explain "moderate family needs" by the trial court, Ms. Gaston explained that "family needs" are limited to whether a defendant has a significant other. Because Defendant was divorced and not in a monogamous relationship, he was assessed with a moderate need for family. She also testified that any comments or statements by Defendant were incorporated into the presentence report verbatim.

Defendant's presentence report was admitted without objection. The report revealed that Defendant was forty-four years old and divorced with three children, two of whom were still dependents. Defendant's verified employment record showed that he began his employment at Swift Enterprises on November 1, 2016, and was earning $10,416

monthly at the time he was terminated. Prior to his employment at Swift Enterprises, Defendant worked as director at U.S. Xpress, making $8,500 monthly. In the report, Defendant stated that he had "lost most everything due to this case and all of his assets [were] frozen." Defendant also reported that he was a party to a pending civil case in Hamilton County pertaining to "restitution in this case" and that he was $200,000-$300,000 in debt.

Regarding his health history, Defendant reported that both his mental and physical health were "excellent." He stated that he "may have drunk alcohol for one year and stopped in 2000" and that he had never used illegal drugs. Certificates of courses Defendant had completed in jail were introduced as a collective exhibit.

Defendant testified at length about how his faith had been "restored" since his incarceration and that God turned his "mistake" into the "miracle" of preaching to fellow inmates. He acknowledged that he let down his family, friends, Mr. Swift, and Swift Enterprises. He stated that three days before his arrest, he prayed for God to "[g]et [him] out of the money" and the deceit. Defendant testified that should he receive a community corrections sentence, he would live with his mother, had a plan for obtaining employment, and had a pending interview for a job in the automotive industry. Defendant pointed out several people who were in the courtroom as a show of support, namely, his father, his stepmother, his ex-wife, his daughter, and three pastors. Defendant testified that he was "absolutely" willing to pay restitution if ordered by the court.

Defendant agreed that he was the leader in the commission of the embezzlement scheme with the two co-defendants, that he used their Transcard accounts to receive funds from MasterBrand, that he used their log-in information to accomplish the theft, and that the crime occurred while he was the COO at Swift Enterprises.

Mary Davis, a program specialist in the community corrections program, testified that she was not familiar with how the program operated under the "old grant" but her current responsibilities included using the STRONG-R assessment to determine whether clients were eligible for the program. She confirmed that the community corrections program was for people with needs based on mental health or substance abuse issues and that a person assessed as "low risk" for substance abuse issues was not eligible for community corrections. She confirmed that in the past few months prior to her testimony, clients in the program were being reviewed in court to determine whether they should remain in the program. She acknowledged that some clients remained in the program because their admittance predated recent changes to the program and added that most of the clients who no longer had a recognized need under the program had since been "moved down to probation." She testified that a person no longer eligible for the program was grandfathered in to remain in community corrections or moved to probation. She was not

specifically aware of a case where a person had been ordered to go to jail because they had become ineligible for community corrections. Ms. Davis testified that the changes to the program began in July 2022. Ms. Davis agreed that the intent of the program was to find programs alternative to incarceration.

The proof was closed following Ms. Davis's testimony, and the State asked the court to apply three enhancement factors: Defendant was the leader in the commission of the offense involving two or more criminal actors; the amount taken was particularly great; and Defendant abused his position of private trust in a manner that significantly facilitated the commission of the crimes. *See* T.C.A. § 40-35-114(2), (6), (14). The State pointed out that Defendant's minimum fifteen-year sentence was not an offense eligible for probation, argued that the 452 instances of thefts Defendant committed constituted a long history of criminal conduct, and stated that incarceration was necessary to avoid depreciating the seriousness of the offense. The State also pointed out that Defendant was not a candidate for community corrections based on recent changes to the program. The State asked the court to order Defendant to pay the full amount of $271,000 in restitution, noting that Defendant had agreed to pay that amount. The trial court then inquired about changes in the restitution statute:

The Court: I know that the law has changed.[2] So it used to be that regardless of what the objective amount was a Court couldn't just find it. It had to be regarding ability to pay. I've been thinking about that too, and I would think for any individual paying a bill each and every single month, $700, maybe a little less than a mortgage but it's more than most people's car payments, but even if, you know, restitution, hypothetically parole – let's just say you get parole at 30 percent, let's say it's, just for easy numbers, ten years, that's 120 months. $700 a month times 120 months is $84,000. It doesn't even get you anywhere close and that would, in my opinion, be a sizable debt to be paying each and every single month. Do I have under the new law the ability to impose [$]271[,000] but then also set a minimum and then it could be converted to a civil debt?

The State: I think Your Honor can and I also do – there was someone that testified there's current civil litigation going on in this case. I

---

[2] It appears the trial court may have been referring to Tennessee Code Annotated section 40-35-304(d), which changed after Defendant had committed the crimes and before sentencing but was not applicable to Defendant.

- 8 -

would also point out to the Court that restitution may be modified at any point during the time that the sentence is in essence still pending. So even a person on parole, while not on probation, could still come before the Court and say I was ordered. Or let's say there was $100,000 worth of – to use simple numbers, $100,000 seized and tied up in the civil litigation which then gets awarded to Greg Swift. Well, that would defray the total restitution amount. The restitution could then be modified down. So I do think that the Court has the ability to subsequently modify restitution payments up or down, honestly.

Defendant argued for a community corrections sentence, but did not discuss or advance any argument about restitution.

*Trial Court's Findings and Sentencing Order*

In determining Defendant's sentence, the trial court considered the factual basis of the plea, the proof at sentencing, statistical information from the Administrative Office of the Courts, and the principles and purposes of sentencing. The trial court found Mr. Swift to be "a very good and credible witness" and "[o]ne of the more interesting witnesses . . . [to] come before this criminal circuit court" based in part on his remarkable career, appearance, and demeanor. The trial court also accredited the testimony of Ms. Gaston.

The trial court found it "tough to measure" Defendant's testimony, noting it felt as if Defendant were giving "a sermon." In the trial judge's nineteen years on the bench, the court could not recall "so many words cited to faith, gospels, scriptures, calls to higher authority, biblical references." The trial court accredited Defendant's testimony and found that he had accepted responsibility for his conduct and was remorseful for what he had done.

The trial court applied three enhancement factors: Defendant was the leader in the commission of the offense involving two or more criminal actors; Defendant committed the offense to gratify his desire for pleasure or excitement; and Defendant abused his position of private trust in a manner that significantly facilitated the commission of the crimes. *See* T.C.A. § 40-35-114(2), (7), (14). The trial court placed great weight on Defendant's leadership in the commission of the offenses because unlike his co-defendants, Defendant "manipulate[d] this multilayered deception and multilayered theft" and used his experience to concoct a scheme that ran unabated and unnoticed for eight months. The trial court found Defendant's plan to be "ingenious" in that U.S. Xpress was not aware one could engineer fake lumper fees or even knew to be on the lookout for such a vulnerability.

The trial court found that Defendant involvement's in the day-to-day operations of Swift Enterprises as its COO "significantly facilitated" his ability to commit the theft and that Defendant had abused his position of private trust as COO of the company, its employees, and Mr. Swift by nearly bankrupting the company and forcing the company to downsize in order to make U.S. Xpress whole.

In terms of finding enhancement factor seven, the trial court found this factor to be applicable by a preponderance of the evidence because Defendant committed the theft "to gratify his desire for a very lavish and opulent lifestyle for a short period of time." According to the trial court, Defendant treated the ill-gotten cash as "fun money" which he "blew" on cars and guns.

The trial court recognized that Defendant had "zero" prior criminal history but found this to be "unremarkable." While the court acknowledged that Defendant's conduct neither caused nor threatened serious bodily injury and Defendant had lived several decades without engaging in criminal conduct, the trial court gave neither factor any weight. T.C.A § 40-35-113(1), (13).

Although Defendant satisfied the minimum statutory requirements for community corrections, the trial court found Defendant to be unsuitable for community corrections due to his "sustained intent to violate the law, to peel through many layers, to employ others to utilize many different processes to, . . . facilitate this intelligent and willful theft." In considering the principles of sentencing, the trial court held that two of the three considerations for confinement under Tennessee Code Annotated section 40-35-103 did not apply to Defendant: a long history of criminal conduct and unsuccessful attempts at measures less restrictive than confinement. *See* T.C.A. § 40-35-103(1)(A), (C). The trial court instead found that confinement was necessary to avoid depreciating the seriousness of the offense. *See id.* § 40-35-103(1)(B). While not violent, horrifying, or shocking, the trial court found the crime to be "extremely excessive" and "to an exaggerated degree" and cited *State v. Travis*, 622 S.W.2d 529, 534 (Tenn. 1981).

The trial court found that a Range I, sixteen-year sentence in the Tennessee Department of Correction to be the least severe measure necessary to achieve the purposes for which the sentence was imposed. *See* T.C.A. § 40-35-103(4). After considering Defendant's parole eligibility, the trial court ordered restitution in the amount of $100,000, with a monthly minimum payment of $700, should Defendant be released on parole. Although the trial court found that "it would take $271,000 to make Greg Swift and Swift Enterprises whole," the trial court set the restitution amount at $100,000, because Defendant's ability to pay was limited as he would be serving his sentence in prison. The

trial court added that despite Defendant's work history, he may have difficulty getting a job when released due to the underlying theft conviction.

Following the imposition of the sentence, Defendant filed this timely appeal.

**Analysis**

*I.      Restitution*

Defendant contends the trial court erred 1) in setting the restitution at $100,000, without making "any significant" findings on his financial resources, his ability to pay, or why $100,000 was appropriate; and 2) in setting a monthly restitution payment that could not satisfy the total restitution amount during the length of the sentence and conditioned upon the possibility of being released on parole.[3]  The State responds that the trial court imposed a reasonable restitution award, considered Defendant's ability to pay, and properly conditioned payment on being released on parole.  However, the State concedes that the matter should be remanded for the trial court to remove the payment schedule or impose one that can be satisfied before the expiration of Defendant's sentence.

Challenges to restitution orders are reviewed under an abuse of discretion standard, affording a presumption of reasonableness to the trial court's ruling.  *State v. Cavin*, 671 S.W.3d 520, 528 (Tenn. 2023); *State v. Gevedon*, 671 S.W.3d 537, 543 (Tenn. 2023).  "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party."  *Cavin*, 671 S.W.3d at 528 (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)); *Gevedon*, 671 S.W.3d at 543.

"The purpose of restitution is not only to compensate the victim but also to punish and rehabilitate the guilty."  *State v. Johnson*, 968 S.W.2d 883, 885 (Tenn. Crim. App. 1997); *Cavin*, 671 S.W.3d at 528.  For some crimes, like theft, restitution is required.  *See* T.C.A. § 40-20-116(a) ("[w]henever a felon is convicted of stealing or feloniously taking or receiving property, . . . the court shall, . . . order the restitution of the property, and, in case this cannot be done, that the party aggrieved recover the value assessed against the prisoner").

Restitution is commonly imposed as a condition of probation.  *Id.* §§ 40-35-104(c)(2); -304(a).  It can also be ordered in combination with an incarcerative sentence. *Id.* § 40-35-104(c)(2); *State v. Cole*, No. W2022-00656-CCA-R3-CD, 2023 WL 4267224,

---

[3] Because Defendant's first and second issues relate to the propriety of the restitution order, we will address them together.

at *3 (Tenn. Crim. App. June 29, 2023), *no perm. app. filed.* When restitution is ordered as a condition of probation, the trial court must specify an amount and a time for payment. *Gevedon*, 671 S.W.3d at 542 (distinguishing difference between restitution as condition of probation and restitution as part of sentence); *see* T.C.A. § 40-35-304(c). When the trial court orders restitution as a part of a defendant's sentence, subsection 40-35-304(g) of the restitution statute applies. *Gevedon*, 671 S.W.3d at 542. Under subsection 40-35-304(g), a defendant sentenced to the payment of restitution "shall be responsible for the payment of the restitution until the expiration of the sentence imposed by the court, and any payment or performance schedule established by the court shall not extend beyond the expiration date[.]" T.C.A. § 40-35-304(g)(2). Trial courts are not however, required to impose payment schedules for restitution. *Id.* § 40-35-304(c); *Gevedon*, 671 S.W.3d at 542. If a trial court in its discretion decides not to impose a payment schedule, the time by which a restitution order must be paid is the expiration of the defendant's sentence. T.C.A. § 40-35-304(g)(2); *Gevedon*, 671 S.W.3d at 542.

While there is no designated formula or method for determining restitution, the amount must be reasonable. *State v. Smith*, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). Indeed, restitution which cannot be fulfilled "serves no purpose" to a defendant or victim. *Gevedon*, 671 S.W.3d at 544. In determining the restitution amount, the trial court must consider the victim's "pecuniary loss" which is limited to special damages "as substantiated by evidence in the record or as agreed to by the defendant." T.C.A. § 40-35-304(e)(1). The burden of proving the victim's pecuniary loss lies with the State. *Gevedon*, 671 S.W.3d at 529.

Any ordered restitution amount that remains unpaid when the payment period or sentence has expired may be converted into a civil judgment by the victim. *Id.* § 40-35-304(h) (describing the procedure for conversion). However, "basing the amount of restitution upon a civil judgment is palpable error because personal injury judgments ordinarily include general damages, and general damages are specifically excluded from restitution by T.C.A. § 40-35-304(e)." *State v. Irick*, 861 S.W.2d 375-77 (Tenn. Crim. App. 1993); *Cavin*, 671 S.W.3d at 528-29; *see also Gevedon*, 671 S.W.3d at 544 (finding that the trial court erred by setting restitution at an unreasonably high amount by relying on a later conversion to a civil judgment). A defendant, victim, or district attorney general may, at any time during the sentence, petition the trial court to waive, adjust, or modify the restitution order. T.C.A. § 40-35-304(f).

In this case, the trial court made the following findings in determining the victim's pecuniary loss, the restitution award, and minimum monthly restitution payment:

> As it relates to restitution, I factually find that it would take $271,000 to make Greg Swift and Swift Enterprises whole, but I do not find that since

[Defendant] is going to be incarcerated that he has the ability to pay. Despite his good up-until-this-theft work history – I mean it looks good on a resumé. He did have a very good well-paying job. Even when he's out, he's going to be hampered by this felony theft conviction. And so taking [D]efendant's ability to pay, I'm going to order restitution in the amount of $100,000, and I'm going to order that he pay a minimum of $700 a month if, in fact, he does make parole. That's not the total that would be needed to make Mr. Swift whole, but I am – I do have to consider [D]efendant's ability[,] or in this case[,] lack of ability to pay into consideration and it is a prison sentence.

As Defendant's crimes occurred between September 2020 and May 2021, the trial court was required to consider "the financial resources and future ability of the defendant to pay or perform" once the victim's pecuniary loss was determined. T.C.A. § 40-35-304(d) (2021).[4] Here, in setting the restitution amount, the trial court did not engage in the required statutory analysis regarding Defendant's financial resources. The trial court's findings do not reveal how the court arrived at $100,000 as the restitution amount from the agreed-upon pecuniary loss of $271,000. Nor do the findings show how the court arrived at the monthly payment amount of $700. We note that before rendering its decision on restitution, the trial court mentioned $84,000 and $100,000, as potential restitution amounts, and $700, as a monthly payment amount, but each figure was based on a hypothetical budget, and not on any evidence substantiated in the record. T.C.A. § 40-35-304(e)(1).

While the trial court properly considered that Defendant's incarceration and future job prospects as a convicted felon would no doubt affect his ability to pay, the trial court did not analyze Defendant's ability to pay the restitution in light of the other evidence available in the record such as Defendant's resources, education, employment potential, training (including training completed while incarcerated), and age. We acknowledge that the record regarding Defendant's finances is not robust, but the record does include Defendant's affidavit of indigency entered on September 15, 2021, and used by the court for the purpose of appointing counsel, in which Defendant disclosed that he was forty-four years old with a lengthy and solid employment history, and no reported physical or mental health issues. In the affidavit, Defendant left blank the line for identifying the amount of money owed creditors. As for any personal property valued over $250, Defendant wrote: "All assets frozen by the court." Defendant noted that he was a party to a lawsuit putting him in debt of $200,000-$300,000. *See State v. Conley*, No. E2022-00237-CCA-R3-CD, 2023 WL 3736821, at *6 (Tenn. Crim. App. May 31, 2023) (holding that trial court did not abuse its discretion in imposing a $500 monthly payment, despite a remand to determine

---

[4] As of January 1, 2022, the statute makes consideration of a defendant's financial resources and ability to pay permissive rather than mandatory. T.C.A. § 40-35-304(d) (Supp. 2022).

- 13 -

restitution amount, where the court considered defendant's testimony regarding her current employment, her future plans for employment, her income, and her expenses), *no perm. app. filed*; *State v. Sanders*, No. M2014-00346-CCA-R3-CD, 2015 WL 526818, at *10-11 (Tenn. Crim. App. Feb. 9, 2015) (rejecting State's concession for remand for clarification on trial court's findings on restitution where the trial court's findings showed that the court considered the defendant's $47,000 in assets, his earning potential, and limited expenses in determining the restitution award). Although "the trial court does not need to make specific, individual determinations on the [d]efendant's financial resources and future ability to pay," we conclude that the trial court did not properly consider these facts, as required under the statute, in setting the restitution amount. *Cole*, 2023 WL 4267224, at *5.

Additionally, to the extent the trial court relied on a possible civil judgment to determine the restitution amount and the monthly payment amount, neither figure is afforded the presumption of reasonableness, but constitutes "palpable error." *Cavin*, 671 S.W.3d at 528-29. We reiterate, the possibility of a future civil judgment cannot be considered when setting the restitution amount in a criminal case. *Id.* Moreover, any litigation to convert the balance of a restitution award into a civil judgment must commence "upon *expiration* of the time of payment or the payment schedule[.]" T.C.A. § 40-35-304(h)(1) (emphasis added).

Because restitution is a sentencing matter, "*Bise* specifically requires trial courts to articulate the reasons for the sentence in accordance with the purposes and principles of sentencing in order for the abuse of discretion standard with a presumption of reasonableness to apply on appeal." *State v. Pollard*, 432 S.W.3d 851, 861 (Tenn. 2013) (citing *State v. Bise*, 380 S.W.3d 682, 698-99 (Tenn. 2012)). For these reasons, we remand the case for a new restitution hearing to be conducted in compliance with the procedure mandated by Tennessee Code Annotated section 40-35-304 in effect at the time Defendant committed the theft.

Turning to Defendant's second issue regarding the payment schedule, in light of the decision to vacate the restitution order and to remand for a hearing on the restitution amount as required under the restitution statute, we find it unnecessary to address whether the schedule is reasonable. We note that should the trial court set a payment schedule, it shall not extend beyond the expiration of Defendant's sentence. *See* T.C.A. § 40-35-304(g)(2). As the Supreme Court recently held, the trial court "may" set a payment schedule but is not required to do so. Therefore, should the trial court decide not to impose a payment schedule, the time by which a restitution order must be paid is the expiration of the sentence. T.C.A. § 40-35-304(g)(2). We recognize that a remand to determine the victim's pecuniary loss and Defendant's ability to pay may affect the restitution amount Defendant

is ordered to pay, which in any event shall not exceed an amount which Defendant can satisfy prior to the expiration of his sentence.

Finally, a defendant's potential for parole is a proper circumstance for the trial court to consider in determining a restitution award. *See Sanders*, 2015 WL 526818, at *11 (considering the likelihood of defendant being released within three years, giving him seven years of community release to pay restitution); *State v. Bottoms*, 87 S.W.3d 95, 106-08 (Tenn. Crim. App. 2001) (considering a defendant's eventual parole, employment history, education, indigency status, and future employment potential); *Cole*, 2023 WL 4267224, at *5 (noting that parole is a proper circumstance for trial courts to consider). We conclude the trial court properly considered Defendant's potential release on parole in determining his ability to pay.

## II.     Denial of Community Corrections

Defendant challenges the trial court's denial of alternative sentencing, specifically, community corrections. The State contends the trial court properly exercised its discretion when it ordered Defendant to serve a sixteen-year sentence in confinement. We agree with the State.

The trial court is granted broad discretion to impose a sentence anywhere within the applicable range, regardless of the presence or absence of enhancement or mitigating factors, and the resulting sentence will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10; *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012) (applying presumption of reasonableness and abuse of discretion standard of review to decisions involving alternative sentencing).

The sentencing statute provides certain guidelines on whether a defendant is eligible for alternative sentencing. For instance, a standard offender convicted of a Class C, D, or E felony, is considered a favorable candidate for alternative sentencing in the absence of evidence to the contrary. T.C.A. § 40-35-102(6)(A). To qualify for consideration for punishment in the community, an offender must meet all of the following criteria:

(A) Persons who, without this option, would be incarcerated in a correctional institution;

(B) Persons who are convicted of property-related, or drug- or alcohol-related felony offenses or other felony offenses not involving crimes against the person as provided in title 39, chapter 13, parts 1-5;

- 15 -

(C) Persons who are convicted of nonviolent felony offenses;

(D) Persons who are convicted of felony offenses in which the use or possession of a weapon was not involved;

(E) Persons who do not demonstrate a present or past pattern of behavior indicating violence; and

(F) Persons who do not demonstrate a pattern of committing violent offenses.

*Id.* § 40-36-106(a)(1) (2021).

An offender is not automatically entitled to community corrections upon meeting the minimum requirements for eligibility. *State v. Ball*, 973 S.W.2d 288, 294 (Tenn. Crim. App. 1998); *State v. Grigsby*, 957 S.W.2d 541, 547 (Tenn. Crim. App. 1997). Rather, once the trial court determines that the defendant is eligible for a community corrections sentence, the trial court then applies the sentencing considerations set forth in Tennessee Code Annotated section 40-35-103, as well as the general sentencing guidelines, to determine whether the defendant is entitled to a community corrections sentence. *Grigsby*, 957 S.W.2d at 547.

Pursuant to Tennessee Code Annotated section 40-35-103, the trial court should look to the following considerations to determine whether a sentence of confinement is appropriate:

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C).

This Court has held that "[i]n order to deny an alternative sentence based on the seriousness of the offense, the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree, and the nature of the offense must outweigh all factors

favoring a sentence other than confinement." *State v. Grissom*, 956 S.W.2d 514, 520 (Tenn. Crim. App. 1997) (internal quotation marks omitted) (quoting *State v. Bingham*, 910 S.W.2d 448, 454 (Tenn. Crim. App. 1995)).

We find no error in the trial court's sentencing determinations. The record reflects that the trial court properly considered the enhancement and mitigating factors, imposed a sentence within the applicable range for the offense, and made detailed findings of fact in support of both the length and manner of service of the sentence imposed. The trial court recognized that Defendant met the minimum statutory requirements for eligibility for community corrections, but denied the request for community corrections due to the nature and circumstances of the offense.

Defendant argues that the trial court's decision was improper because Defendant had no criminal record and measures less restrictive than confinement had not been previously applied to him. The trial court stated on the record that neither factor was applicable to Defendant for expressly the reasons Defendant complains of on appeal. The trial court found incarceration to be proper based on the "exaggerated and excessive" nature and circumstances of the offense, finding that the length of time during which Defendant stole money, the excessive amount of money taken, Defendant's breach of a client's network, the impact of Defendant's theft on Swift Enterprises, Mr. Swift, and other Swift Enterprises employees, Defendant's extravagant and wasteful use of the stolen money, and his failure to stop stealing until he was arrested showed that confinement was necessary to avoid depreciating the seriousness of the offenses. *See State v. Crabtree*, No. M2021-01154-CCA-R3-CD, 2023 WL 2133831, at \*20-21 (Tenn. Crim. App. Feb. 21, 2023) (affirming denial of alternative sentencing for a defendant who lacked a criminal record but stole $240,000 over a four-year period from Fentress County Finance Department where she was employed, and also stole $2,000 from a memorial ballpark where she was its treasurer by executing more than 900 fraudulent transactions to fund a lavish lifestyle for herself and her family), *no perm. app. filed*.

Indeed, over nearly an eight-month period, Defendant authorized 495 fake lumper fee advances resulting in a loss of $271,000 to U.S. Xpress, nearly bankrupting Swift Enterprises in repaying the loss to U.S. Xpress, and jeopardizing the livelihood of the employees at Swift Enterprises from downsizing and layoffs. Authorizing a lumper fee was not simple or obvious, but required "a lot of time investigating" in order to breach and penetrate several layers of U.S. Xpress's network without detection. Further, Defendant breached the system twice, first to authorize the fee, and then after payment, to revert the status to no fee, in order to avoid detection by U.S. Xpress and Swift Enterprises. Defendant stole from a client who was also a long-time former employer, continued unabated in his scheme by "dumping it daily" and working on Saturdays to commit the theft. At sentencing, Defendant testified that three days before his arrest, he prayed for

deliverance from his crimes; yet the record shows he authorized a fake lumper fee the day before his arrest. Defendant used the stolen money not to provide necessities for himself or his family but to lead an extravagant lifestyle.

We conclude that the trial court did not abuse its discretion in finding that the nature and circumstances of the offenses greatly outweighed any factors favoring a sentence other than confinement. We affirm the trial court's denial of alternative sentencing. Defendant is not entitled to relief.

### Conclusion

The judgment of the trial court is affirmed as to the length and manner of service of Defendant's sentence; however, the trial court's order regarding restitution is vacated and the case is remanded for a new restitution hearing consistent with this opinion.

_____
JILL BARTEE AYERS, JUDGE